### CARDINELL CORPORATION et al. v. SCRIPTEX INK & PASTE CO.

No. 8949.

District Court, E. D. Pennsylvania.

Jan. 11, 1937.

Wallace D. Newcomb, Henry N. Paul, Jr., and Fraley & Paul, all of Philadelphia, Pa., for plaintiffs.

Albert M. Cohen and Harry Langsam, both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a suit in equity for infringement of United States letters patent No. 1,475,-932, issued December 4, 1923, to Cappon, for a single-fluid ink eradicator and the process of eradicating ordinary inks from paper substantially by the application of the fluid.

Infringement is not denied, and the only substantial question is as to the validity of the patent.

Claims 1, 2, 4, 5, 8, and 9 are in suit, and claim 4 may be taken as typical. It is: "A single-fluid eradicator comprising a mixture of an alkali hypochlorite with an alkali phosphate."

A number of prior art patents and disclosures were cited by the defendant against the patent. None of these, with the exception of "Gmelin's Handbook of Chemistry," a publication of 1849, require any special consideration. In general, they disclose that alkali hypochlorites have been used as bleaches and sometimes as ink eradicators, alone and in combination with other substances. Also, that combinations have been made in which some substance has been combined with a hypochlorite to stabilize it or counteract its tendency to decompose. They also show that water soluble phosphates, also alone and in combination, have been used to eradicate iron stains or stains resulting from ferrous compounds. None of them show the combination of an alkali hypochlorite with an alkali phosphate, and none of them have produced a commercially usable single-fluid ink eradicator.

Before dealing with the Gmelin disclosure, it may be well to say a few words about the place of the plaintiff's patent in the art of removing ink marks, writings, or spots from paper. Most inks made today consist of two principal elements, an aniline dye and a ferrous or ferric salt. The dye is the color, and the iron is to give the writing permanence. There are certain other substances present which may be disregarded.

There is no known single substance which will both bleach the dye and remove the iron. Certain hypochlorites will neutralize the dye, but a brown stain, consisting of iron hydroxide, later transformed to iron oxide, will remain. Quite a number of substances are known which will eliminate the iron stains but will not affect the coloring matter.

One might think that all that would be necessary to make a single-fluid eradicator would be to combine these two classes of agents, but the difficulty has always been that they have been found to be mutually destructive, so far as function is concerned, and, if a workable eradicator was ever produced, it was so unstable as to be totally useless commercially; that is, it would become inert within a very short time after it had been manufactured.

The result was that prior to Cappon, the only eradicators in general use consisted of two separate fluids, sold in two separate bottles. In use, one was first applied to the ink and then blotted, then the other applied. The process was certainly inconvenient, and if the elements got mixed by putting the wrong stopper or spreader back into a bottle, the substance quickly deteriorated.

The essence of the Cappon patent lies in the discovery not only that the two substances named will operate satisfactorily, one upon the coloring matter and one upon the brown iron stain, but that they can be mixed together in a single compound which will remain stable and efficient for an indefinite period.

I find that the plaintiff's contention is correct, that this patent represents the first successful and the first commercially saleable single-fluid ink eradicator. In addition, he has upon his side a record of more than ordinary commercial success.

Turning now to the Gmelin disclosure, in the course of describing a process for the production of hypochlorous acid, the author states that when chlorine is passed into a solution of terbasic phosphate of soda until it is no longer absorbed, a liquid is obtained "having strong bleaching properties." This liquid contains hypochlorous acid plus a residue which consists, partly at least, of phosphate of soda. Thus there is disclosed, in a bleaching fluid, the plaintiff's second element, an alkali (sodium) phosphate in combination with hypochlorous acid. The defendant's contention is that hypochlorous acid is in all respects the equivalent of an alkali hypochlorite (the first element of the plaintiff's patent), and that the Gmelin solution is therefore a complete anticipation.

It may be conceded that the Gmelin solution would operate successfully as an ink eradicator. I have had some made according to Gmelin's teachings, and there is no

question that it is just about as efficient as the plaintiff's.

The difficulty, however, lies with the proof relating to its stability. Hypochlorous acid is exceedingly unstable. The testimony of the defendant's expert upon this point seems to make it clear that the combination is not commercially practicable, as the following from the record indicates:

"Q86. No, you do not understand me; I will rephrase the question. A solution, then, of hypochlorous acid and alkali phosphate would not function as an ink eradicator if the hypochlorous acid remained in its acid form? A. It would function as an ink eradicator, but it would not be stable.

"Q87. When you say it would not be stable, how soon would it decompose? A. Depending on the amount of acid present and the light, the effect of light.

"Q88. Would that be a matter of days or a matter of hours? A. If the product is strongly acid, it might decompose in a few minutes. If it has less acidity, it might be stable for a few days, but it would not make a commercial product."

No range of equivalence will include a substance which, though it may produce a given result, lacks the quality necessary to practical usefulness. Therefore, I do not think that the Gmelin solution can possibly be held to be an anticipation of the plaintiff's patent.

It was suggested to the plaintiff's expert upon cross-examination that the passing of chlorine into the solution of phosphate of soda might be stopped before reaching the point where it is no longer absorbed, and that, if that were done, the resultant would be a stable liquid, commercially usable. The witness hazarded a guess which I interpret to mean that the resultant would be approximately the same as Gmelin's product; no more stable. Possibly, a stable product could be obtained in this way. There is no definite testimony one way or the other, and any thought that I might have would be an uninformed guess. However, even if it were so, the fact remains that Gmelin does not teach it. His disclosure admits of no variation from his direction to pass the chlorine into the solution "until it is no longer absorbed." I do not think that the modification of the process is sufficiently disclosed nor that the hypothetical product which might be obtained can be an anticipation.

Claims 1, 2, 4, 5, and 9 are therefore held valid and infringed.

 As to claim 8, I think that it is too broad to be supported by the specification. It appears to be an attempt to monopolize a field which the inventor himself has not fully occupied. I therefore hold it invalid.